[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION de DEFENDANT'S POST JUDGMENT MOTION TO REOPEN JUDGMENT FOR FRAUD (200)
The parties' marriage was dissolved on March 27, 1996 after an uncontested hearing during which the court approved their written settlement agreement (122) and ordered it incorporated into the decree (123). The present motion seeks "An order vacating the equitable distribution award" contained in the judgment for the plaintiffs failure to disclose ownership of shares of stock alleged to have substantial value at the time.
The court finds the following facts:
Both parties are MBA graduates and both were active in running their investment companies during their marriage until 1993 when the defendant became inactive.
The defendant was chief financial officer of Altier Financial Corporation and of Altier Investment Company, a Subchapter S Corporation from 1983 until 1993 (transcript p. 4, 10/11/01).
The parties each owned half of the stock in Altier Investment Company.
Said corp. purchased shares of Dial Info in 1986 and 1987. Said shares were sold to Altier Financial Services UK for $232,000 in 1990. The transaction was designed by the defendant to repay funds they had borrowed personally from Altier Financial and the profit sharing plan as a non-taxable way, i.e. to transfer one asset to the UK company in return for cash (transcript p. 83, 10/10/01).
Altier Financial Services UK was a corporation 99% owned by the defendant as of June 30, 1992. At that time said Corporation held, as an asset, an investment in Dial Info valued at $232,000 as shown on its statement of financial condition dated June 30, 1992 (Defendant's Exhibit D). Another asset listed was "Firearms" worth $44,993. No liabilities were listed and total shareholders' equity was listed as $615,880.
The British corporation was dissolved in 1992 and the defendant became the owner of its assets. The defendant took delivery of the firearms. He did not have the shares reissued in his name although he became the beneficial owner of them.
Dial Info was renamed Automated Call Processing Corporation (hereinafter ACPC) and has continued in business.
In 1992 as part of the liquidating distribution the plaintiff received the firearms, which he valued at $20,000, and he was the beneficial owner of the 27, 000 shares of Automated Call Processing corporation. CT Page 3576
The plaintiff continued to be the beneficial owner of said shares until after the entry of the judgment of dissolution.
For some time prior to the commencement of the dissolution action the parties had been experiencing financial difficulty in meeting their expenses.
In the Spring of 1995 the defendant inquired of the plaintiff:
 "How am I going to feed the children, there is no money. We're borrowed to our eyeballs, we have no — there must be some assets. Think of anything we can sell. And then at that time I said what about, among other what abouts, was what about that Dialinfo stock.
Q: Did Mr. Denis respond to your inquiry?
A: Yes
Q: What did he say to you?
A: He said that that stock had been written off
Q: Was there any further discussion about the stock?
A: No." (Transcript p. 58, 10/10/01)
The plaintiff testified that the parties discussed the ACPC stock in March, 1996 just prior to the divorce decree and at the defendant's request he called Mr. Kenneth Jones, the CEO of ACPC who informed him that the shares were worthless and there were no buyers at any price. The court finds that this conversation took place in the Spring of 1995 before the litigation began.
Deloitte Touche LLP issued an independent auditors' report to the Board of Directors and Shareholders of Automated Call Processing Corporation giving its financial position as of April 30, 1995 (Defendant's Exhibit E).
The balance sheet dated April 30, 1995, contained in said report states that there were 1,832,481 shares issued and outstanding and that total shareholders' equity was $6,958,856 or $3.80 per share. The 27,000 shares owned by the plaintiff then had a book value of $102,600.
The chairman and CEO of Automated Call Processing Corporation Kenneth CT Page 3577 E. Jones, issued a letter dated September 21, 1995 addressed to "Dear Shareholder", enclosing ACP's annual report for the fiscal year ended April 30, 1995. The letter states that the company's financial condition continues to be very strong. It also described the respective conditions of the Ditech subsidiary and the Globe Wireless subsidiary. Part of the letter reads as follows:
 "Ditech — Ditech's echo canceller business has grown as a result of its ability to deliver innovative new products at rock bottom prices. In 1994, we had a surge in orders from one customer. 1995's sales, although lower, exhibited a much healthier mix of customers with none exceeding 20% of the total. Ditech has recently announced a new line of echo cancellation products focused on markets outside North America. The Company will also announce another product line of amplifiers for optical fiber circuits this coming spring. We expect both revenues and operating income to increase in 1996.
 Globe Wireless — Globe Wireless is building a global wireless network that will allow ships and yachts to communicate via electronic mail and the internet! Messages to ships currently must be delivered by satellite at a cost of $6.00 to $10.00 per minute or by telex at a cost of $2.00 to $4.00 per minute. Globe Wireless will halve this cost and add features such as sending word processing documents and spreadsheets. We believe Globe Wireless will capture a significant share of the $1.0 billion market for marine communications. However, the Company is still in the early stages of development. We expect losses at the 1995 level to continue throughout 1996.
 I have enclosed the product literature from each company. I think you'll find it informative. We are very pleased with the improvement and potential in Call processing, and the outstanding performance at Ditech. We are very excited about the possibilities at Globe Wireless. Please call me at 415-357-5100 if you'd like to discuss the Company or if you have any questions.
Please mark your calendar for the Annual Meeting of Shareholders which will be held Tuesday, November 21, 1995, at 9:00am at the World Trade Club of San CT Page 3578 Francisco, Ferry Building, The Embarcadero, San Francisco, CA."
Mr. Jones testified that the plaintiff called him in early 1996, either February or March, asking if there was any market for his shares of ACP. Mr Jones testified that he responded:
 "I told him that there had been one — one person had purchased some shares six or eight months earlier at a dollar a share, that the company was in a financial condition that would not allow it to redeem any shares, and that I knew of no one that would buy these shares, and that I felt that they were worthless at the time."
The court finds the testimony of Mr. Jones to be incredible in that it is totally inconsistent with his statements contained in his letter to shareholders. It is totally inconsistent with the auditor's report. Finally, it is totally inconsistent with the defendant's testimony which the court finds credible.
The plaintiff's assertion that he had not seen the audit report for 1995 begs for an explanation as to how it found its way into his stored papers. The defendant's attempt to plead ignorance of the conditions of his investment is inconsistent with his business background.
The law requires clear and convincing proof that fraud has been committed. Billington v. Billington, 220 Conn. 212, 217 states the elements necessary to find that a fraud has been committed. The defendant failed to list his interest in ACPC on his financial affidavits produced prior to the final hearing (Defendant's Exhibit #8) or for the final hearing (Defendant's Exhibit #9). The untrue statement may be by omission as well as by commission. The defendant was entitled to and did rely on the plaintiffs affidavit of March 27, 1996, Id. 220. The defendant relied on the said affidavit to her detriment. The fact that many of the plaintiffs papers were at the residence occupied by the defendant does not mean that she can be charged with knowledge of their contents. The plaintiffs plea of ignorance is of no avail for he should have known and can be charged with the knowledge that a reasonably prudent person knew or should have known under the circumstances.
The court finds that the plaintiffs investment was in a viable company that was solvent and continued to do business throughout the 1990s and the claim that it was "worthless" is not supported by the evidence.
Sometime in 1997 the plaintiff received a payment of $325,000 in CT Page 3579 connection with his ownership of said stock. The payment was made to Altier Financial Services UK and as successor to the dissolved corporation the plaintiff was the owner of said money.
In the context of an allegation of fraud, Billington states:
 "Although marital parties are not necessarily in the relationship of fiduciary to beneficiary, we believe that no less disclosure is required of such parties when they come to court seeking to terminate their marriage."
Having found both the testimony of Mr. Jones and the plaintiff not credible and having found the testimony of the defendant credible the court is satisfied that the elements of fraud have been proven by clear and convincing evidence, Wilkes v. Wilkes, 55 Conn. App. 313, 326; Billington, supra, citing Varley v. Varley, 180 Conn. 1, 4 that there must be clear proof of the perjury or fraud and that there is a substantial likelihood that the result of the new trial will be different. The latter is clear from the post judgment evidence regarding ACPC and the eventual IPO.
The judgment of dissolution is opened and a new hearing is ordered with respect to the financial orders concerning the division of assets entered as part of the judgment.
So Ordered.
 ___________________ HARRIGAN, J.T.R.